2009 Ark. App. 190
**Krissy THOMPSON, Appellant,**

v.

**SPARKS REGIONAL MEDICAL CENTER, Appellee.**

**No. CA 08–1050.**

Court of Appeals of Arkansas.

March 18, 2009.

Law Offices of Charles Karr, P.A., by: Charles Karr, Fort Smith, for appellant.

Mitchell, Williams, Selig, Gates & Woodyard, PLLC, by: Michelle H. Cauley and Delena C. Hurst, Little Rock, for appellee.

JOSEPHINE LINKER HART, Judge.

Krissy Thompson appeals from the grant of summary judgment in favor of appellee, Sparks Regional Medical Center (Sparks). On appeal, she argues that the trial court erred in granting summary judgment because she stated a claim under the Emergency Medical Treatment and Active Labor Act (EMTALA) and Sparks owed a duty of care to her. We affirm.

On Friday, March 14, 2003, Thompson suffered a severe degloving injury[1] in a motorcycle accident. An ambulance transported her to the emergency room at St. Edward Mercy Medical Center (St. Edward). Dr. William Paul King, an emergency-room physician at St. Edward, saw Thompson at 6:36 p.m. St. Edward did not have a plastic surgeon on call. Dr. King spoke with plastic surgeon Dr. James Kelly who was on call at Sparks that night; however, Dr. Kelly's hospital privileges had been revoked at St. Edward, and he refused to treat Thompson.

Thompson's father, who was a registered nurse and nursing supervisor at Crawford Memorial Hospital (Crawford), called the emergency room at Sparks and spoke to charge nurse Jennifer (Kinnemer) Hillis. At the request of Thompson's father, Hillis called Dr. Kelly at home, and Dr. Kelly informed Hillis that he would not accept Thompson as a patient because she was already being treated at St. Edward. In a subsequent telephone conversation, Hillis informed Thompson's father that she did not have the authority to admit patients or require a physician to do so. Hillis transferred Thompson's father to nurse supervisor, Deborah Gale, who confirmed that a nurse did not have the authority to admit patients or refer patients to physicians. She did, however, inform Thompson's father that he could bring his daughter to Sparks's emergency room and be treated. Thompson never presented at Sparks.

Subsequently, Thompson's father spoke to an emergency-room physician at Crawford who called plastic surgeon Dr. Roger Bise who resided in Fort Smith. Dr. Bise arrived at St. Edward fifteen minutes later and began treating Thompson.

---

1. The skin on her right foot, starting just above her ankle was essentially peeled off and her big toe was nearly detached.

Thompson brought suit against St. Edward, Dr. King, Dr. Kelly, Sparks, and five John Doe defendants. She subsequently non-suited Dr. Kelly. After Sparks prevailed in its summary-judgment motion, Thompson non-suited Dr. King, St. Edward, and the John Doe defendants to prosecute this appeal.

Summary judgment is to be granted by a trial court only when it is clear that there are no genuine issues of material fact to be litigated and the moving party is entitled to judgment as a matter of law. *Jackson v. Sparks Reg'l Med. Ctr.*, 375 Ark. 533, 294 S.W.3d 1 (2009). Once a moving party has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. *Id.* After reviewing undisputed facts, summary judgment should be denied if, under the evidence, reasonable minds might reach different conclusions from those undisputed facts. *Id.* On appeal, we determine if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of its motion leave a material question of fact unanswered. *Id.*

Thompson first asserts that the trial court erred in granting summary judgment because she stated a claim under EMTALA. We disagree. EMTALA has provisions that proscribe both "dumping," the refusal to treat an emergent patient who presents at a hospital, and "reverse dumping," refusal to accept an appropriate transfer of a patient requiring a hospital's specialized capabilities. We hold that Thompson did not prove her entitlement to protection under either of these provisions.

Regarding the dumping provisions, EMTALA states in pertinent part:

In the case of a hospital that has a hospital emergency department, if any individual ... comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—

(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

(B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

42 U.S.C. § 1395dd(a). Simply stated, while Thompson asserts that her father expressed a willingness to go to Sparks for treatment, the undisputed fact is that she remained at St. Edward. We note that in a remarkably similar case, *Miller v. Medical Center of Southwest Louisiana*, 22 F.3d 626 (5th Cir.1994), the Fifth Circuit held that in order to trigger the anti-dumping provision in EMTALA, the patient must actually "come to" the hospital, notwithstanding the fact that the administrator of a potential gaining hospital called a clinic with inadequate facilities and instructed them not to transport an uninsured patient to his hospital. The *Miller* court reasoned that the "comes to" phrase was dispositive for two reasons. First, it unambiguously describes the class of individuals that are covered by the statute and where the language is unambiguous "judicial inquiry is complete." 22 F.3d at 629. Second, ignoring the "comes to" clause would render the clause a nullity, which would violate the rules of statutory construction that require the courts to interpret each part of the statute so as to "not render one part inoperative." *Id.* We find the reasoning in *Miller* to be persuasive. Accordingly, Thompson did not qualify for protection under EMTALA's anti-dumping provision.

Likewise, we hold that Thompson failed to demonstrate entitlement to protection

under EMTALA's reverse-dumping provisions. EMTALA states in pertinent part:

A participating hospital that has specialized capabilities or facilities (such as burn units, shock-trauma units, neonatal intensive care units, or (with respect to rural areas) regional referral centers as identified by the Secretary in regulation) shall not refuse to accept an appropriate transfer of an individual who requires such specialized capabilities or facilities if the hospital has the capacity to treat the individual.

42 U.S.C. § 1395dd(g). Thompson does not allege, nor would it be appropriate to do so, that Sparks was the kind of specialized facility such as a burn unit or neonatal intensive care unit that EMTALA contemplates. Furthermore, Thompson did not require any facilities that were not available at St. Edward. Indeed, it is not disputed that she ultimately was successfully treated at St. Edward, notwithstanding Thompson's claim that the delay in finding a plastic surgeon contributed to the loss of her big toe.

Thompson also argues that the trial court erred in concluding that Sparks could not be held liable under a theory of medical malpractice. She argues that *Chatman v. Millis*, 257 Ark. 451, 517 S.W.2d 504 (1975), is factually distinguishable and therefore does not control. Rather, she contends that liability may be imposed under our Medical Malpractice Act, which proscribes a healthcare provider from prematurely abandoning a patient. Ark.Code Ann. § 16–114–201(3) (Repl. 2006). We disagree.

The broad holding of *Chatman* is that a medical provider owed no duty to a person who was not its patient. The supreme court stated that where the defendant doctor "made no examination" of the plaintiff and in fact did not know him or had never seen him, the plaintiff was not a "patient." Likewise, in the instant case, Thompson did not present at Sparks and was not examined there, and she did not otherwise allege that the hospital or its personnel knew her. Accordingly, we hold that she did not qualify as a patient, and therefore Sparks owed her no duty of care.

Thompson's resort to section 16–114–201 does not compel a different result. It states in pertinent part that:

"Medical injury" or "injury" means any adverse consequences *arising out of or sustained in the course of the professional services being rendered by a medical care provider,* whether resulting from negligence, error, or omission in the performance of such services; or from rendition of such services without informed consent or in breach of warranty or in violation of contract; or from failure to diagnose; or from premature abandonment of a patient or of a course of treatment; or from failure to properly maintain equipment or appliances necessary to the rendition of such services; or otherwise arising out of or sustained in the course of such services.

(Emphasis added.) Because it is undisputed that Sparks never provided "professional services," the plain reading of the statute does not impose liability on it for Thompson's alleged injuries.

Affirmed.

VAUGHT, C.J., and BROWN, J., agree.