Brandon J. Harrison, Judge, concurring. This appeal asks whéther a treating psychiatrist may be liable to a nonpatient who is intentionally harmed by a patient. A core issue immediately arises: does the Medical Malpractice Act apply as a matter of course, as Dr. Vest has argued? Or does some other tort-law apply — -whether it be the typical negligence doctrine, or a more particularized version of negligence that many states have applied when faced with third-party harm cases? There is no clear answer or approach under Arkansas law, and that is why my colleagues and I diverge on:a key issue in this case. The circuit court granted summary judgment to Dr. Vest on two'grounds: (1) it decided that the Act applied to the casé and ruled that the Act’s two-year statute' of limitations time-barred Fleming’s complaint against Dr. Vest; and (2) the court separately ruled that Dr. Vest had quasi-judicial immunity, a decision that, independent of the limitations issue, ended the case against the doctor. We all agree that Dr. Vest has no quasi-judicial immunity and unanimously reverse the circuit court’s immunity ruling as a matter of law. I differ, however, on the decision to characterize and analyze Fleming’s ease against Dr. Vest as one for alleged medical malpractice. Whether Arkansas’s Medical Malpractice Act applies affects the limitations question presented in this case and aspects of this litigation’s future course. ■ 111 This case is not one for medical malpractice bé’cause it does not truly probe whether Dr. Vest properly treated a person with whom he had a doctor-patient' relationship. This ease turns, at least in part, on whether Dr. Vest owed a legal duty to control or confiné patieni 'Lands so as to protect' Fleming, who was not a patient. That strikes me as being a fundamentally different question' that needs an analytical framework apart from the Act. My colleagues state that Fleming’s complaint alleges medical malpractice. One supreme court case, Dodson v. Charter Behavioral Health System of Northwest Arkansas, Inc., 335 Ark. 96, 983 S.W.2d 98 (1998), supports their view in some respect. But Dodson does not have a clear holding that we can apply to this case— meaning the case does not expressly address and hold, that a claim arising from a doctor-patient relationship that results in the patient fatally shooting a third party is an “action for medical injury” under the Act. Dodson is procedurally different than this ease, it answered different questions, and it recites both an ordinary-negligence standard and the duty owed under the Act. Dodson is not .a case that squarely addressed and answered the characterization issue that this case presents. I agree with my colleagues that the definition of “medical injury” is a broad one. Ark.Code Ann. § 16-114-201(3) (Supp. 2015). But the definition should not include every conceivable “adverse consequence” that arises once a medical-care provider begins to treat a patient. Ark.Code Ann. § 16-114-201(3). Every legal concept should have its practical limit. As one.court has put it: . |12While it may seem that there should be a remedy for every wrong, this is an ideal limited perforce by the realities of this world. Every injury has ramifying consequences, like the rippling of the waters, without end. The problem for the law is to limit the legal consequences of wrongs,to a controllable degree_ [Accordingly]- [t]he final step in the duty inquiry ... is to make a determination of the fundamental policy of the law, as to whether the defendant’s responsibility should extend to such results. Jaworski v. Kiernan, 241 Conn. 399, 696 A.2d 332, 336 (1997). A troublesome point with applying the Medical Malpractice Act in this case is that the shooting itself -must arguably be the actionable “adverse consequence.” Because until Lands, shot Fleming, the latter man was not “injured” by Dr. Vest’s treatment of Lands. Yet how can tlie violent, intentional ■ act that Lands committed against Fleming equate to a medical injury? To so conclude injects a legal fiction into an area of the law where one is not needed to carry out the general assembly’s intent, in real-world affairs. The law of unintended cdnsequ'ences may have just been triggered. Applying the Act in a case like this one arguably undermines the general assembly’s main reason for promulgating the Act, because it seems to'expand the poténtial tort liability that medical-care providers could face. See Act of Apr. 2, 1979, No. 709, § 11, 1979 Ark. Acts 709 (Emergency Clause); see also Jarmie v. Troncale, 306 Conn. 578, 50 A.3d 802, 808 (Conn.2012) (expanding the liability of health care providers [under a medical-malpractice act] would not reduce the potential for harm because health-care-providers would be required to do no more than they already must do to fulfill their duty to patients). Contrary to my colleagues’ decision, the better approach is to tether medical-malpractice claims to adverse consequences that arise from a medical-care provider/patient relationship. This is the traditional approach, one this court and our supreme court have followed before. See Chatman v. Millis, 257 Ark. 451, 453, 517 S.W.2d 504, 505 (1975); see also Thompson v. Sparks Reg’l Med. Ctr., 2009 Ark. App. 190, at 5, 302 S.W.3d 35, 38 (“The broad holding of Chatman is that a medical provider owed no duty to a person who was not its patient.”). The so-called traditional approach does not, of course, necessarily mean that Dr. Vest would owe a duty to Fleming. . What duty,- if any,- did Dr. Vest owe to Fleming under the circumstances? That is the fighting issue in this casé, and courts have split over this question since the seminal case Tarasoff v. Regents of University of California, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976). Arkansas’s common law does not generally recognize a duty to control the actions of another person “even if the former has the practical ability to govern the latter.” Trammell v. Ramey, 231 Ark. 260, 262, 329 S.W.2d 153, 154 (1959). This general rule does not usually apply when there is a special relationship between the parties. See Keck v. Am. Emp’t Agency, Inc., 279 Ark. 294, 652 S.W.2d 2 (1983). The Restatement of Torts states, ‘.‘One who takes ¡charge of a third person whom he knows or should know to be likely to cause bodily.harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.” Restatement - (Second) of Torts § 319. So under the Restatement approach, a psychiatrist may owe a duty to a person when the risk of harm to the person is foreseeable. State courts vary in how they approach third-party harm cases; some are quite nuanced and fulsome in their,treatment of the question. See, e.g., Estates of Morgan v. Fairfield Family Counseling Ctr., 77 Ohio St.3d 284, 673 N.E.2d 1311 (1997) (holding that a psychor therapist must protect against or control a patient’s violent propensities and that a “professional-judgment standard” - applied); Jarmie v. Troncale, 306 Conn. 578, 50 A.3d 802, 808 (2012) (third-party claim against a doctor for failure 114to warn failed as a medical-malpractice claim because the person harmed and the doctor did not have a physician-patient relationship); see also Civil Liability of Psychiatrist Arising out of Patient’s Violent Conduct Resulting in Injury to or Death of Patient or Third Party Allegedly Caused in Whole or Part by' Mental Disorder, 80 A.L.R.6th 469 (2012) (collecting cases)'. This case brings Arkansas to an important judicial crossroads: will our courts continue to expand the Act’s definition of what constitutes a “medical injury” and thus pull more providers into the Act’s orbit? Or will they begin taking a more nuanced approach, especially in cases where a medical-care provider’s patient commits an intentional harm upon a third person, and more carefully analyze whether a provider can be sued in tort at all? I express no opinion on the merits of the complaint, nor whether a duty in tort exists. My point here is solely that the Medical Malpractice Act — and the law that goes hand-in-glove with it — does not apply. So I would not apply the Act’s two-year limitations period or the continuous-treatment doctrine. It also means that the circuit court should be directed to address, as a matter of law, whether a tort-based duty runs from Dr. Yest to Fleming apart from the Act. How it would determine whether a duty exists apart from the Act is for the parties to argue and the circuit court to decide. Compare Coca-Cola Bottling Co. of Memphis, Term. v. Gill, 352 Ark. 240, 257, 100 S.W.3d 715, 725 (2003) (existence of a legal duty is a question of law and requires that the defendant be able, to reasonably foresee an appreciable risk of harm to others), with Estates of Morgan, supra-, Jarmie, swpra. | isThe circuit court’s decision to grant quasi-judicial immunity to Dr. Vest should be reversed. But because this case has the flesh of a medical-malpractice case— but not its heart and bones — I would also reverse the decision to apply the Act and remand this ease for further proceedings.